635 So.2d 84 (1994)
Cloyd E. CLAIR, Appellant,
v.
GLADES COUNTY BOARD OF COMMISSIONERS and Insurance Servicing & Adjusting Company, Appellees.
No. 91-3997.
District Court of Appeal of Florida, First District.
January 25, 1994.
Dawn E. Perry-Lehnert Harry A. Blair, P.A., Fort Myers, for appellant.
Gerald W. Pierce, Henderson, Franklin, Starnes & Holt, P.A., Fort Myers, for appellees.
ERVIN, Judge.
In this workers' compensation case, appellant/claimant appeals the judge of compensation claims' (JCC's) denial of her claims for continued palliative care with an authorized chiropractor, and payment of the chiropractor's outstanding bills, exercise equipment, membership in either a gym or a therapeutic exercise program, penalties, interest, costs, and attorney's fees. Because we consider that the issue in the instant case is controlled by the decision of this court in Alford v. G. Pierce Woods Memorial Hospital, 621 So.2d 1380 (Fla. 1st DCA 1993), we affirm. Nevertheless, we also consider that, for the reasons expressed infra, Alford was incorrectly decided, and therefore certify a question to the Florida Supreme Court regarding whether a physician practicing outside the peer group of the physician authorized to treat an employee is qualified to offer an opinion that the *85 continuation of such furnished care is not reasonable and necessary.
On November 3, 1983, appellant injured her back in a work-related accident, which was accepted by the employer/carrier (E/C) as compensable. In 1986, her right to future compensation benefits was settled by a lump-sum payment that did not affect her entitlement to future medical benefits. She continued to be treated by Dr. Crowley, a chiropractor. Subsequently the E/C discontinued payments of the chiropractor's bills and, in support thereof, produced the deposition testimony of Dr. Arpin, a neurosurgeon, and Dr. Conant, an orthopedic surgeon, both of whom stated that claimant's continued chiropractic treatment was neither reasonable nor necessary.
Appellant testified at the hearing that she continued to suffer pain in her back, legs, and shoulders, and the only relief she has received is temporary easement of the pain by the chiropractic treatments. Contrary to the testimony of Drs. Arpin and Conant, Dr. Crowley testified that continuing chiropractic care was in fact reasonable and necessary. In accepting the opinion testimony of Drs. Conant and Arpin over that of Dr. Crowley, the JCC noted that claimant had been furnished chiropractic treatment during an extremely long period of time for essentially a soft tissue injury, yet remained in constant pain. The judge considered that her ongoing pain raised a question concerning the continued effectiveness of Dr. Crowley's treatment. The judge also accepted Dr. Arpin's opinion that reliance upon weekly chiropractic treatment was not in the claimant's best interest and should be terminated, and that claimant's needs would be better served by her enrollment in an exercise program.
At the outset of the hearing on the claims, appellant's attorney specifically objected to the opinion testimony of Drs. Arpin and Conant, arguing that chiropractic physicians "should be judged by their own peers in that sense as to what's reasonable chiropractic care, not someone  outside that specialty that may have prejudice against that whole type of treatment and not understand it, even though they may be a medical doctor." Nevertheless, the JCC determined that further chiropractic care was not reasonable and necessary, based upon the opinion testimony of Drs. Conant and Arpin, and did not specifically address the argument claimant's attorney raised at the hearing.
Appellant, initially unrepresented by counsel on her appeal, filed a rambling, digressive brief which raised numerous points, including whether Dr. Crowley's treatment was properly denied, and whether her treatment was reasonable and necessary. Thereafter, an attorney filed a reply brief on appellant's behalf; but, after considering the briefs, and because Alford, which involved the same issue, was pending, we ordered the parties in the instant case to file supplemental briefs addressing the issue of whether Section 440.13, Florida Statutes, permits a physician, practicing outside the peer group of the physician whose care had been authorized, to opine as an expert that the furnished care is not reasonable and necessary.
In questioning whether Drs. Arpin and Conant are qualified to express such opinion, we note that Section 440.13(2)(a), Florida Statutes (1983),[1] provides in part:
The carrier shall not deauthorize a health care provider furnished by the employer to provide remedial treatment, care, and attendance, without the agreement of the employer, unless a deputy commissioner determines that the deauthorization of the health care provider is in the best interests of the injured employee. Any list of health care providers developed by a carrier not including pharmacists from which health care providers are selected to provide remedial treatment, care, and attendance shall include representation of each type of health care provider defined in s. 440.13(3)(d)1.d, Florida Statutes, 1981, and shall not discriminate against any of the types of health care providers as a class.

(Emphasis added; footnote omitted.)
Section 440.13(3)(d)1.d, Florida Statutes (1981), referred to in subsection 1(2)(a) above, provides:

*86 "Health care provider" means a physician licensed under chapter 458, an osteopath licensed under chapter 459, a chiropractor licensed under chapter 460, a podiatrist licensed under chapter 461, an optometrist licensed under chapter 463, a pharmacist licensed under chapter 465, or a dentist licensed under chapter 466.
In our interpretation of the above provisions, we have stated that an E/C may be responsible for unauthorized medical care when a claimant has requested medical treatment by one of the classes of physicians described in the statute, but the E/C has instead offered alternative treatment from a different class, if it later appears that the requested treatment was reasonable and medically necessary. Kirkland v. Harold Pratt Paving, Inc., 518 So.2d 1320, 1324-1325 (Fla. 1st DCA 1987), review denied, 525 So.2d 878 (Fla. 1988). For example, if an E/C extends only orthopedic or neurological care after a claimant has specifically requested chiropractic care, the E/C's offer "does not meet the statutory obligation to authorize a chiropractor in those instances where a claimant requests chiropractic care that is ultimately found to be reasonable and necessary." Id. at 1325. This does not mean that an E/C is required to offer a list of health care providers solely from the class of providers requested by an employee; however, the "carrier's list of health care providers must include a representative of each type of provider defined in Section 440.13(1)(f), Florida Statutes."[2]Deriso v. Great W. Meats, 534 So.2d 748, 749 (Fla. 1st DCA 1988).
The above opinions clearly state that during the selection process of a requested list of physicians, discrimination against a specific requested class may occur if an E/C fails to offer a representative from such class. We consider that section 440.13 may also reasonably be interpreted as stating that discrimination occurs as well during the deauthorization process if a JCC relies upon the testimony of a physician practicing outside the peer group of the physician whose care was furnished in reaching any decision to deny such treatment. This conclusion, we think, is reinforced by reading the above provisions of subsections 440.13(2)(a) and 440.13(3)(d)1.d in pari materia with those of subsection 440.13(1)(c), defining the term "medically necessary" as

any service or supply used to identify or treat an illness or injury which is appropriate to the patient's diagnosis, consistent with the location of service and with the level of care provided. The service should be widely accepted by the practicing peer group, should be based on scientific criteria, and should be determined to be reasonably safe.
(Emphasis added.)
The above provision requires the requested or supplied medical service to "be widely accepted by the practicing peer group." We consider, by examining the legislative reference to the term "peer,"[3] that it was not reasonably within the legislature's contemplation that physicians of one school of practice be deemed qualified to give opinions regarding the appropriateness of treatment provided by physicians of another school or community of practice. For example, section 440.13(1)(e) defines "peer review committee" as meaning "a committee composed of physicians licensed under the same authority as the physician who rendered the services being reviewed." (Emphasis added.) Admittedly, the term "peer review committee" is not used in relation to a requested change or deauthorization of the health care provided an employee, but rather is specifically applied to review of overutilization of services rendered by health care providers; nonetheless, it appears that ordinarily only physicians of the same practice as the physician whose services are reviewed serve on peer review committees. Cf. Lamounette v. Akins, 547 So.2d 1001, 1002 (Fla. 1st DCA 1989) (to determine whether chiropractic *87 physician overutilized services rendered to an injured employee, the physician's records were submitted to the Chiropractic Peer Review Committee).
Our interpretation of section 440.13(3) is consistent with the general rule recognizing that physicians of one school of practice are incompetent to testify in malpractice actions against physicians of other schools regarding whether such physicians' treatments conformed with the requisite degree of skill and care in their practice areas. Defendants in such actions are entitled to limit such opinion testimony to that of competent practitioners of their own schools of medicine.[4] 61 Am.Jur.2d Physicians, Surgeons, & Other Healers § 353 (1981).
In questioning whether physicians from a different licensed practicing peer group from that provided to the claimant are not qualified to express an opinion as to the reasonableness and necessity of the care furnished, we have not overlooked section 90.702 of the Florida Evidence Code, which broadly states that "a witness [may be] qualified as an expert by knowledge, skill, experience, training, or education,"[5] yet we find nothing in section 440.13 evincing any legislative intent to incorporate the provisions of section 90.702. It is a well-recognized statutory maxim that a more specific statute dealing with a particular subject (here section 440.13) controls over a statute that covers the same subject more generally. Department of Health & Rehab. Servs. v. American Healthcorp of Vero Beach, Inc., 471 So.2d 1312, 1315 (Fla. 1st DCA 1985), opinion adopted, 488 So.2d 824 (Fla. 1986).
We are nevertheless constrained to affirm, based upon this court's prior decision in Alford v. G. Pierce Woods Memorial Hospital, holding that a physician of a different peer group from that of the physician sought to be authorized may be qualified as an expert under section 90.702 to opine that the requested care is not reasonable and necessary. Under Alford, there must be a showing on the record that an orthopedist, for example, has training and experience in chiropractic skills of sufficient magnitude to establish that the witness is, in fact, an expert in chiropractic medicine. Alford, 621 So.2d 1380, 1382-83. Accord Spears v. Gates Energy Prods., 621 So.2d 1386, 1387 (Fla. 1st DCA 1993).
In the case at bar, the E/C failed to show that either Dr. Conant or Dr. Arpin was qualified to testify in the area of chiropractic medicine, as neither physician was asked a single question about his or her "knowledge, skill, experience, training, or education" in that field, as is required by section 90.702. Alford. Although claimant objected at deposition to Dr. Conant's lack of expertise to offer an opinion, she made no such objection during the deposition of Dr. Arpin, and thus failed to preserve the issue for appellate review in regard to Dr. Arpin's testimony.[6] We conclude, therefore, that the JCC erred in relying upon the expert testimony of Dr. Conant, but properly relied, under Alford, on the opinion of Dr. Arpin in denying the claims for continuation of chiropractic care, as we must assume that she was fully qualified to testify about chiropractic medicine.
Nevertheless, claimant did preserve the issue of whether section 440.13 permits a physician, practicing outside the peer group of a physician whose care has been authorized, to testify as an expert on the reasonableness of the furnished care, notwithstanding that such physician may be qualified to testify as an expert under 90.702. Accordingly, because it appears that the issues raised in both this case and in Alford may be recurring, we certify the following question to the Florida Supreme Court as one of great public importance:
WHETHER SECTION 440.13, FLORIDA STATUTES, PERMITS A PHYSICIAN, *88 PRACTICING OUTSIDE THE PEER GROUP OF THE PHYSICIAN WHOSE CARE WAS AUTHORIZED, TO OPINE AS AN EXPERT THAT THE FURNISHED CARE IS NOT REASONABLE AND NECESSARY?
AFFIRMED.
ZEHMER, C.J., concurs.
KAHN, J., concurs and dissents with opinion.
KAHN, Judge, concurring in part and dissenting in part.
This case is controlled by Alford v. G. Pierce Woods Memorial Hospital, 621 So.2d 1380 (Fla. 1st DCA 1993), and accordingly I concur in affirmance. I cannot agree with the majority, however, that Alford was incorrectly decided; nor can I agree that anything raised in this case warrants certification to the Florida Supreme Court. Accordingly, I dissent from the suggestion that Alford was wrongfully decided, and from the decision to certify this case to the supreme court.
A paucity of the majority opinion deals with the testimony of Dr. Conant and Dr. Arpin. These doctors did not merely state that weekly chiropractic treatment should be terminated. Dr. Conant testified that he saw no medical basis to support the finding of necessity for any treatment of the claimant after April 26, 1984. He supported this conclusion with a detailed assessment of the claimant's condition as of 1984. In May 1984, claimant had full trunk mobility and no neurological deficits. Subsequently she had full range of lumbar and cervical motion. She had no evidence of any radiculopathy or myelopathy. She was normal neurologically. Dr. Conant was unable to identify any objective basis for claimant's continuing subjective complaints after April 26, 1984. Dr. Joy Arpin, a board certified neurological surgeon practicing in Cape Coral, found claimant to be normal, with no neurological findings. Studies ordered by Dr. Arpin revealed a normal MRI scan, a normal dorsal spine, a normal cervical spine, a normal lumbar spine, and a normal bone scan.
The JCC accepted the testimony of Drs. Conant and Arpin. Thus, competent substantial evidence exists in this record to support discontinuation of care, including chiropractic care.
In a recent unanimous pronouncement of this court, sitting en banc, we stated, "In workers' compensation cases, as in civil cases, we are mindful of the need to encourage results that comport with logic and common sense, rather than results founded solely upon inelastic judge-crafted rules." Ullman v. City of Tampa Parks Department, 625 So.2d 868, 873 (Fla. 1st DCA 1993). Since I subscribe to this reasoning, I find it necessary to consider the consequences of the majority's suggestion that deauthorization must be based upon testimony of a physician licensed under the same authority as the physician who rendered the services being reviewed. Slip Op. 7. Such a limitation, while applicable to peer review committees, is not applicable to the JCC's determination as to the appropriateness of care, nor is the majority's reasoning in this regard supported by the various statutes regulating Florida physicians and referenced by the majority at 86.
A medical doctor in Florida is authorized to diagnose, treat, operate, or prescribe for any human disease, pain, injury, deformity, or other physical or mental condition (e.s.). § 458.305, Fla. Stat. (1993). Osteopathic physicians have "the same rights as physicians and surgeons of other schools of medicine with respect to the treatment of cases or holding of offices in public institutions." Section 459.011(2), Fla. Stat. (1993).[7] Practitioners of podiatric medicine in Florida may engage *89 in "the diagnosis or medical, surgical, palliative, and mechanical treatment of ailments of the human foot and leg, and may prescribe drugs that relate to this scope of practice." Section 461.003(3), Fla. Stat. (1993).
The definition of practice of chiropractic, which is the field involved in the present case, is far more specifically delineated by the Florida Statutes. In general, a chiropractic physician may "examine, analyze, and diagnose the human living body and its diseases by the use of any physical, chemical, electrical, or thermal method; use the x-ray for diagnosing; phlebotomize ...; and use any other general method of examination for diagnosis and analysis taught in any school of chiropractic." Section 460.403(3)(b), Fla. Stat. (1993). Chiropractic physicians may "adjust, manipulate, or treat the human body by manual, mechanical, electrical or natural methods; by the use of physical means or physiotherapy, including light, heat, water, or exercise; by the use of acupuncture; or by the administration of foods, food concentrates, food extracts, and proprietary drugs and may apply first aid and hygiene, but chiropractic physicians are expressly prohibited from prescribing or administering to any person any legend drug, from performing any surgery (except as specifically provided in the statute), or from practicing obstetrics." Section 460.403(3)(c), Fla. Stat. (1993). Chiropractic physicians "may analyze and diagnose physical conditions of the human body to determine the abnormal functions of the human organism and to determine such functions as are abnormally expressed and the cause of such abnormal expression." Section 460.403(3)(e), Fla. Stat. (1993).
A review of these statutory standards reveals that medical doctors and osteopathic physicians are qualified and licensed in the broadest manner. Their qualifications and licensure would appear to encompass those areas of practice allowable for podiatrists and chiropractors. The regulatory statutes do not, then, suggest an automatic disqualification of medical doctors to give testimony such as that relied upon by the JCC in this case. Moreover, under the suggestion of the majority, two board-certified orthopedic surgeons, one licensed as an osteopath and one licensed as a medical doctor, would be incompetent to testify as to the need for care rendered by the other. Similarly, an orthopedic surgeon specializing in foot surgery would be incompetent to comment on the need for the attention of a podiatrist. I seriously doubt the legislature intended such a result when it listed the various classes of health care providers and their licensing chapters in section 440.13(3)(d)1.d, Florida Statutes (1981). Op. at 85-86. Quite simply, I conclude, as did the majority in Alford, that our task as a reviewing court is to determine whether the JCC's decision to deauthorize (or to authorize) treatment is supported by competent substantial evidence. I see no need for the rather rigid approach urged by the majority in the present case.
The record in this case indicates that Clair, by her own stipulation (as reflected by the washout settlement), reached maximum medical improvement in the spring of 1984 with a 1% permanent physical impairment. A judge of compensation claims, with ample evidentiary support, has now decided that no need exists to require the employer/carrier to provide additional chiropractic care, many years after the injury and the washout settlement. This case should be marked "CLOSED."
NOTES
[1] In that section 440.13 has undergone numerous changes since 1983, the year of claimant's compensable accident, all references to section 440.13 in this opinion relate to the 1983 version, except as otherwise indicated.
[2] This provision is currently renumbered 440.13(1)(h), and includes medical physicians, osteopaths, chiropractors, podiatrists, optometrists, and dentists. Section 440.13(1)(h), Fla. Stat. (Supp. 1992).
[3] Although peer is not defined in section 440.13, the term is commonly defined as "a person or thing of the same rank, value, quality, ability, etc." Webster's New World Dictionary 1048 (2d college ed. 1980).
[4] The general rule has been modified by statute in Florida. See 766.102(2), Fla. Stat. (1991).
[5] Section 90.702, Fla. Stat. (1991).
[6] Preservation of error in this case is governed by Florida Rule of Civil Procedure 1.330(d)(3)(A), which requires an objection to an expert's qualifications, under circumstances such as those at bar, to be made during the deposition. § 440.30, Fla. Stat. (1991); Suburban Propane v. Estate of Pitcher, 564 So.2d 1118, 1121 (Fla. 1st DCA 1990); Quinn v. Millard, 358 So.2d 1378, 1382 (Fla. 3d DCA 1978).
[7] Currently in Florida, osteopathic physicians hold board certification in the following specialty fields of practice: Addictive Diseases, Anatomic Pathology, Anesthesiology, Critical Care Medicine, Dermatology, Emergency Medicine, Endocrinology, Gastroenterology, General Practice, Internal Medicine, Cardiology, Hematology, Oncology, Diseases of the Chest, Hematology/Oncology, Neurology, Neurological Surgery, Nephrology, Nuclear Medicine, Obstetrics and Gynecology, Obstetrical-Gynecological Surgery, Ophthalmology, Otorhinolaryngology and Oral-Facial Plastic Surgery, Otolaryngology, Otorhinolaryngology, Orthopedic Surgery, Psychiatry, Pediatrics, Plastic and Reconstructive Surgery, Preventive Medicine/Aerospace Medicine, Preventive Medicine/Occupational Medicine, Proctology, Pulmonary Conditions, Radiology, Diagnostic Radiology, Rheumatology, Rehabilitation Medicine, Roentgenology, Diagnostic, Thoracic Cardiovascular Surgery, Thoracic Surgery, Urological Surgery, and Sports Medicine. Florida Osteopathic Medical Association, Yearbook and Directory 1993-1994.